**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| YERBOL ORYNBAYEV and UCONINVEST LLC, <br><br> Plaintiffs, <br><br> v. <br><br> JYSAN HOLDING LLC; JUSAN TECHNOLOGIES LTD.; NEW GENERATION FOUNDATION, INC.; MASUDAL RONY ("RON") WAHID; LORD DAVID CHARLES EVANS OF WATFORD; CHRISTIAN MARTIN BOERNER; AIDOS BEKTURGANOV; and GALYMZHAN YESSENOV, <br><br> Defendants. | Civil Action No. 1:25-cv-1172 <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs Yerbol Orynbayev and Uconinvest LLC hereby bring this Complaint against

Defendants Jysan Holding LLC, Jusan Technologies Ltd., New Generation Foundation, Inc.,

Masudal Rony ("Ron") Wahid, Lord David Charles Evans of Watford, Christian Martin Boerner,

Aidos Bekturganov, and Galymzhan Yessenov, stating as follows:

### NATURE OF ACTION

1.      This case arises from a transnational racketeering scheme that looted a $1.6

billion endowment—established under U.S. law to support Kazakhstan's premier educational

institutions—and diverted its assets into the hands of a politically connected Kazakh oligarch and

his co-conspirators.  The scheme was orchestrated by senior insiders at a U.S.-based nonprofit

and its affiliates, who exploited their control over the endowment structure to execute a

fraudulent asset transfer to the oligarch, enrich themselves with tens of millions of dollars in illicit side payments, and retaliate against whistleblowers who exposed them.

2.     Plaintiff Yerbol Orynbayev, a former Deputy Prime Minister of Kazakhstan and architect of the U.S.-based endowment structure, designed the structural safeguards intended to shield the endowment assets from political interference and corruption. Defendants dismantled those protections from within. Under the guise of a fabricated arbitration and a sham "settlement," they stripped the endowment's investment platform, Jusan Technologies Ltd. ("JTL"), of nearly all its assets—including controlling stakes in Kazakh banks, telecom companies, and real estate—at a miniscule fraction of their value ($75 million), without any competitive process, fairness opinion, or regard for Mr. Orynbayev as a minority shareholder.

3.     At the center of the scheme was Defendant Ron Wahid, the chair of JTL's board, who secretly negotiated the terms of the asset transfer with the oligarch, Defendant Galymzhan Yessenov. Around the same time that Wahid (on behalf of JTL) and Yessenov executed a term sheet outlining this corrupt transfer, Wahid sold his personal 2.3% equity stake in JTL to Yessenov for over $15 million. Wahid later received tens of millions more in side payments. JTL's other directors, Defendants Lord David Evans and Christian Boerner, joined Wahid in approving the transfer to Yessenov, and all three personally collected millions in "closing bonuses" tied to the deal's execution. This looting was accomplished through U.S.-based wire communications and falsified corporate records, including backdated board resolutions and compensation agreements used to justify illegitimate insider payouts. These acts were part of a calculated, ongoing scheme stretching across borders, with the same insiders using the same playbook—deception and intimidation—to extract stolen assets and enrich themselves.

4.      The fallout was swift.  Plaintiffs—Mr. Orynbayev and his investment vehicle Uconinvest LLC—saw their minority equity stake in JTL wiped out.  Unlike every other minority shareholder—including Defendant Wahid, a key perpetrator of the wrongful scheme—who were bought out by Yessenov at or near full value, Plaintiffs were deliberately excluded from any compensation after Mr. Orynbayev objected to the insider-driven settlement, which he castigated as corrupt and marred by conflicts of interest.  And JTL's majority shareholder, Defendant Jusan Holding LLC, was controlled by Wahid and Defendant Aidos Bekturganov, who facilitated the asset transfer to Yessenov.  The effective expropriation of Plaintiffs' shares was punitive and targeted, reflecting retaliation against the sole dissenting JTL shareholder while co-conspirators and compliant stakeholders were rewarded.

5.      Meanwhile, Kazakhstan's Nazarbayev University and Nazarbayev Intellectual Schools—the intended beneficiaries of the U.S.-based endowment structure—were stripped of their financial foundation.  And as Mr. Orynbayev objected and filed suit in the UK—and later cooperated with U.S. authorities investigating the so-called settlement with Yessenov—he was met with retaliatory litigation in Virginia and additional litigation threats in the U.S. and the UK aimed at silencing and discrediting him.

6.      This action seeks to hold Defendants accountable under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") and Virginia law.  Plaintiffs seek compensatory and treble damages, disgorgement, injunctive relief, and the imposition of a constructive trust over assets fraudulently obtained and diverted in violation of U.S. law.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over Plaintiffs' federal civil RICO claim under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).  This Court has supplemental jurisdiction over Plaintiffs' related state law claims pursuant to 28 U.S.C. § 1367.

3

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965, as a substantial part of the events giving rise to the claims occurred in Virginia, and one or more Defendants reside or conduct business in this District.

## PARTIES

9.      Plaintiff Yerbol Orynbayev is a citizen of Kazakhstan and a U.S. permanent resident residing in Florida.  He formerly served as Deputy Prime Minister of the Government of Kazakhstan ("GOK") and Aide to Kazakhstan's President.  Relevant here, Mr. Orynbayev served as a director of JTL from its inception in March 2020 until August 31, 2022, then as a consultant for JTL's parent company, Jysan Holding LLC, from September 1, 2022, to August 27, 2023.  Through his investment vehicle, Unconinvest LLC, Mr. Orynbayev owns a minority (2.3%) stake in JTL.  He is also a whistleblower in matters relating to the fraudulent transfer of JTL's Kazakhstan-based assets to Defendant Galymzhan Yessenov, a politically connected Kazakh oligarch, and has cooperated with U.S. authorities in connection with their investigation.

10.      Plaintiff Uconinvest LLC is a Virginia limited liability company with operations in Virginia and Florida.  Its sole member is the Orynbayev Family Trust, for which Mr. Orynbayev is the sole trustee.  Uconinvest is the investment vehicle through which Mr. Orynbayev holds his minority equity interest in JTL.  Unconinvest was directly harmed by the fraudulent asset transfer orchestrated by the Defendants.  It was the only minority shareholder in JTL excluded from compensation in the insider-driven deal with Yessenov, while all other minority shareholders—including Defendant Ron Wahid—were bought out at or near full value.

11.      Defendant Jysan Holding LLC is a Nevada limited liability company with its principal place of business, on information and belief,  at 8200 Greensboro Dr., Suite 1475, McLean, VA 22120.  JH was a subsidiary of Defendant New Generation Foundation, Inc., until February 2024, when it was transferred under the guise of a sale to the "JH Defense Trust," a

newly created trust whose direct beneficiaries, on information and belief, are JH's directors, Defendants Ron Wahid and Aidos Bekturganov. The JH Defense Trust's sole trustee is Jeffrey Bronheim, a partner at Cohen & Gresser (UK) LLP and the former corporate secretary of JTL. JH is a key vehicle through which the racketeering enterprise operated.

12. Defendant Jusan Technologies Ltd. is a UK private limited company with its principal place of business, on information and belief, at 22a St. James's Square, SW1Y 4JH, London, England. JTL was the holding company for the endowment structure's commercial assets and the primary entity stripped of its Kazakhstan-based assets under the challenged settlement with the oligarch Yessenov.

13. Defendant New Generation Foundation, Inc. was a Nevada nonprofit corporation, granted tax-exempt status under Section 501(c)(4) of the Internal Revenue Code, with its principal place of business, on information and belief, at 1810 E Sahara Ave. No. 587, Las Vegas, NV 89104. Until February 2024, NGF was the sole member of JH, which owned JTL. On information and belief, NGF was administratively or voluntarily dissolved in or around February 2024, following the transfer of its primary asset, JH, to the JH Defense Trust. Under Nevada law, specifically NRS 78.585 and NRS 82.456, NGF can still be sued as a dissolved entity. NGF participated in and facilitated the racketeering and fraud schemes described herein, including but not limited to the collusive transfer of charitable assets, self-dealing compensation arrangements, and the improper winding up and dissolution of the foundation itself.

14. Defendant Masudal Rony ("Ron") Wahid, on information and belief, is a U.S. citizen residing in McLean, Virginia. He served as a director of JH and its board chair, as well as director, board chair, and CEO of JTL, during the period surrounding the settlement with the oligarch Yessenov. Wahid negotiated the settlement directly with Yessenov, structured the

fraudulent asset transfer, and personally enriched himself through termination payments, a backdated option agreement, and lucrative contracts totaling over $50 million, as well as a "closing bonus" of $3.2 million. He also induced Mr. Orynbayev to sell him shares in JTL under false pretenses and excluded Mr. Orynbayev from material negotiations with Yessenov despite his minority shareholder status.

15.     Defendant Aidos Bekturganov, on information and belief, is a U.S. citizen residing in McLean, Virginia. He was one of two directors of JH—alongside Wahid—who approved JH's participation in the corrupt settlement transferring JTL's Kazakhstan-based assets to the oligarch Yessenov for a fraction of their value. As a director of JH and CEO of NGF, Bekturganov played a key role in authorizing and facilitating the transaction. He supported the abandonment of JH and JTL's Nevada RICO lawsuit against the GOK and the execution of the sham settlement with Yessenov. Bekturganov also worked to suppress internal objections and participated in pressuring an employee to remain silent about concerns of fraud. He has longstanding personal ties to Yessenov.

16.     Defendant Lord David Charles Evans of Watford, on information and belief, is a UK citizen residing in London, England. He served as a director of JTL during the period surrounding the settlement with Yessenov, and joined Wahid and Defendant Christian Boerner in JTL board decisions approving it. He received substantial personal financial compensation for his role, including a $1 million "closing bonus." Evans also joined Boerner in approving additional transactions that personally benefitted Wahid, including approving Wahid's backdated and excessive option agreement and Wahid's consulting contracts with JTL. He has longstanding personal ties to Wahid.

17.     Defendant Christian Martin Boerner, on information and belief, is a citizen of Germany residing in Vienna, Austria.  He served as a director of JTL during the period surrounding the settlement with Yessenov and joined Wahid and Evans in JTL board decisions approving it.  He received substantial personal financial compensation for his role, including a $1 million "closing bonus."  Boerner also joined Evans in approving additional transactions that personally benefited Wahid, including approving Wahid's backdated and excessive option agreement and Wahid's consulting contracts with JTL.

18.     Defendant Galymzhan Yessenov, on information and belief, is a citizen of Kazakhstan residing in Kazakhstan.  He is a Kazakh oligarch who acquired control of JTL's Kazakhstan-based assets through a corrupt settlement in mid-2023.  Yessenov filed a pretextual arbitration in January 2023 and used it as leverage to obtain roughly $1.6 billion in assets for $75 million.  He negotiated the settlement directly with Wahid and benefited personally from the insider deal.

## FACTUAL ALLEGATIONS

### A.     The Creation of a U.S.-Based Endowment for Nazarbayev University

19.     Plaintiff Yerbol Orynbayev served as the Deputy Prime Minister of the Government of Kazakhstan ("GOK") from 2007 to 2013, and as Aide to Kazakhstan's President on social and economic issues from 2013 to 2015.

20.     In 2010, the GOK established Nazarbayev University as a flagship Western-style research university.  It was launched in partnership with several prominent U.S. academic institutions and intended to serve as a model for reforming Kazakhstan's higher education system.  As Deputy Prime Minister, Mr. Orynbayev helped lead the creation of the University.

21.     The Nazarbayev Intellectual Schools, a network of selective secondary schools offering modernized, Western-style education, were established earlier, in 2008, as part of the

same broader educational reform initiative.  Mr. Orynbayev likewise played a key leadership role in the creation of the Schools.

22.     In 2019, the Boards of Trustees of Nazarbayev University and Nazarbayev Intellectual Schools engaged Mr. Orynbayev to help design a secure, U.S.-based endowment structure.  The primary objectives were to attract international philanthropic support, ensure long-term financial sustainability, and insulate the endowment assets from political interference or future misappropriation through the legal and institutional safeguards of the U.S. system.

23.     In 2019, with Mr. Orynbayev's guidance, the University's and Schools' Boards established the New Generation Foundation, Inc. ("NGF").  NGF was incorporated as a nonprofit in Nevada and later granted tax-exempt status under Section 501(c)(4) of the Internal Revenue Code.  Under its articles of incorporation, NGF's sole purpose was to provide financial support to Nazarbayev University and Nazarbayev Intellectual Schools.  NGF advanced this mission through endowment management, donor engagement, and long-term financial stewardship.  NGF's articles of incorporation further provide that, upon its winding up or dissolution, its assets "shall be distributed to or for the benefit of, and only to or for the benefit of," Nazarbayev University and Nazarbayev Intellectual Schools.

24.     NGF held its assets primarily through its wholly owned subsidiary, JH, a Nevada limited liability company.  JH, in turn, owned JTL, a U.K.-registered private limited company, as its international investment platform.  JTL owned the endowment structure's assets.

25.     JTL's principal assets consisted of equity in financial institutions in Kazakhstan, as well as telecommunications and real estate assets.  Specifically, JTL owned First Heartland Securities JSC ("FH Securities"), a bank holding company, which in turn owned a controlling interest (78.73% as of year-end 2022) in First Heartland Jusan Bank JSC ("FH Jusan Bank"), a

large commercial bank in Kazakhstan—an interest worth approximately $1.3 billion as of year-end 2022.  JTL also owned a further investment platform, Jusan Ventures, worth approximately $100 million, and publicly traded telecom shares in Kazakhtelecom, worth approximately $60 million, and KCell, worth approximately $111 million—all as of year-end 2022.

26.    The basic endowment structure was as follows:



27.    The endowment structure's largest asset, FH Jusan Bank, was formed in 2020 through the consolidation of three other banks in Kazakhstan acquired between 2018 and 2020. One was ATF Bank, a distressed financial institution previously owned and controlled by

Defendant Galymzhan Yessenov, a businessman and politically connected Kazakh oligarch. Prior to its acquisition by FH Jusan Bank in 2020, ATF Bank—under Yessenov's leadership— had a negative capital balance of hundreds of millions of dollars, and was bailed out by the GOK. Through the GOK-facilitated sale of ATF Bank, Yessenov acquired a roughly 20% stake in FH Jusan Bank and later exploited that position to reassert control over the same and other assets through fabricated legal claims and a corrupt, collusive settlement.

28. In March 2020, Mr. Orynbayev joined the board of directors of JTL as a founding member. Over the next two years, he played a central role in building out its governance, strategy, and institutional credibility. He did not serve as a director of NGF or JH, but advised both informally (and later formally as a consultant for JH) in his capacity as an architect of the endowment structure.

29. In April 2021, as recognition for his role in launching the endowment structure and steering its early financial success, and in anticipation of a potential future IPO of JTL, Mr. Orynbayev was granted an option to acquire a minority equity interest—4.6%—in JTL. This interest was priced at a nominal option-based valuation tied to performance rather than capital investment, and Mr. Orynbayev exercised this option.

30. After Mr. Orynbayev temporarily relinquished his equity stake in JTL in May 2022, the full 4.6% equity was reissued to Uconinvest LLC, Mr. Orynbayev's Virginia-based investment vehicle, on December 29, 2022. The purchase price was approximately $150,000.

31. According to its 2022 audited financial statements, published June 16, 2024, JTL's net assets were over $1.6 billion as of year-end 2022.

**B.    The Government of Kazakhstan's Campaign to Seize JTL's Kazakh Assets**

32.    In early 2022, the GOK launched a campaign to wrest control of JTL's Kazakhstan-based assets—principally FH Jusan Bank.  This campaign marked a sharp departure from the GOK's prior support for the U.S.-based endowment structure, and was motivated by a combination of growing suspicion toward Western-aligned institutions and a political agenda to repatriate valuable banking and other assets under the control of regime-aligned oligarchs.

33.    The GOK deployed the coercive power of the Kazakh state.  Regulatory agencies initiated baseless civil and criminal proceedings against JTL and affiliated entities and personnel; blocked dividend distributions and loan transfers to JTL's U.S. parent; and leveled threats of prosecution.  The Kazakh legislature introduced retroactive legislative measures aimed at restricting or unraveling foreign ownership of domestic banking assets, with JTL and its subsidiaries as the clear targets.

34.    On February 15, 2023, a Kazakh court issued a global asset freeze against JTL. This arose out of a GOK-backed civil suit challenging JTL's ownership structure and seeking repatriation of the structure's Kazakh assets to Kazakhstan—a suit previously dismissed in December 2022 for lack of evidence but promptly refiled by the state.  The litigation barrage, asset freeze, and regulatory blockades formed a coordinated campaign of legal and economic pressure designed to force capitulation, expropriate the endowment assets to Kazakhstan, and eliminate the U.S.-based endowment structure that Mr. Orynbayev designed and implemented.

35.    Although carried out by state actors, this pressure campaign became the pretext and enabling mechanism for a private expropriation.  The Defendants in this case later invoked the supposed regulatory risks and legal hostility in Kazakhstan to justify the fraudulent "settlement" under which JTL's core assets were transferred to the oligarch Yessenov at a gross

undervalue.  In reality, the settlement was not a response to coercion—it was the mechanism through which the expropriation was completed.

C.     **Mr. Orynbayev's Transition and the Insiders' Takeover of JTL**

36.     In or around August 2022, Mr. Orynbayev was asked to step down as a JTL director, which he did on the understanding that this would help facilitate ongoing negotiations with the GOK.  He resigned from JTL's board effective August 31, 2022, but remained involved in the endowment.

37.     Effective September 1, 2022, Mr. Orynbayev entered into a consulting agreement with JH.  The agreement restricted his responsibilities to strategic and business development advice and excluded involvement in litigation, settlements, or financial control.  Nonetheless, due to his institutional knowledge and role in structuring the endowment, he remained involved in sensitive internal discussions.

38.     Also during this period, three new directors of JTL were appointed: Defendants Ron Wahid, Lord David Evans, and Christian Boerner.  According to JTL's 2022 audited financial statements, they were appointed on August 24, June 28, and July 11, 2022, respectively. These individuals were presented as neutral professionals positioned to stabilize the enterprise and manage settlement talks with the GOK.  At the time, Mr. Orynbayev supported the appointments and believed they were made in good faith.

39.     This marked a decisive shift in JTL's governance.  By early 2023, JTL had fallen under the unchecked control of Wahid, Evans, and Boerner.  JTL's parent company, JH, was controlled by its two directors—Wahid and Defendant Aidos Bekturganov.  Mr. Orynbayev— though a minority JTL shareholder and JH consultant—would be sidelined from material

decisions and ultimately deceived in a scheme that not only defrauded him personally but enabled the systematic looting of JTL's assets under the guise of a negotiated resolution.

**D.    Wahid's Capture of Half of Orynbayev's JTL Shares Under False Pretenses**

40.    In or around December 2022, Wahid complained to Mr. Orynbayev that he was not being compensated for his work as a JTL director. Wahid claimed that the GOK and certain figures within NGF were blocking all forms of compensation and that he was preparing to resign. He also alleged financial hardship resulting from his role.

41.    Concerned that Wahid's departure would destabilize JTL at a critical juncture, Mr. Orynbayev—acting on his belief that Wahid had been unfairly denied compensation and was genuinely committed to protecting the endowment—agreed to sell half of his JTL equity to Wahid at the same price he paid for it. Mr. Orynbayev agreed to do this based on Wahid's personal representations that he was uncompensated, was considering resignation, and would ensure that Mr. Orynbayev's remaining minority stake in JTL—2.3%—would be treated the same as Wahid's. These representations, directed at Mr. Orynbayev, were false.

42.    On or around January 23, 2023, Uconinvest transferred 2.3% of JTL's shares— half of Mr. Orynbayev's stake—to Magellan Investment Holdings Limited, a company owned and controlled by Wahid. Wahid paid the same nominal amount Mr. Orynbayev had paid to acquire the shares—roughly $75,000—based on their original option price. Mr. Orynbayev's intent was that Wahid would hold the shares to align his incentives with the endowment's success, and that both parties could potentially resell their respective stakes at market value in the future. Wahid and Mr. Orynbayev agreed to hold their stakes in tandem, with the understanding that they would only redeem or sell on equivalent terms.

43.     As detailed further below, less than two months later, in March 2023, Wahid, acting as JTL's lead negotiator, approved terms of a "settlement" transferring JTL's core assets to the oligarch Yessenov for $75 million.  Around this same time, Wahid sold his own 2.3% stake in JTL to Yessenov for $15.35 million—an implied valuation of JTL exceeding $667 million.  Wahid's personal sale exposes the self-dealing at the heart of the settlement with Yessenov and the targeted exclusion and differential treatment of Mr. Orynbayev, the only minority shareholder who resisted the fraudulent settlement.

44.     Mr. Orynbayev did not learn of Wahid's duplicity until August 2023, when internal whistleblowers revealed that Wahid had been richly compensated and had misled Mr. Orynbayev.  These revelations made clear that Wahid's representations in late 2022 were false, and that his acquisition of the 2.3% stake was procured through fraud.

**E.     JH and JTL's Civil RICO Lawsuit Against the Government of Kazakhstan**

45.     On February 16, 2023, JH and JTL filed a civil RICO lawsuit in the U.S. District Court for the District of Nevada against the GOK and several government-aligned individuals and entities.  *See Jysan Holding LLC, et al. v. Republic of Kazakhstan, et al.*, No. 2:23-cv-00247 (D. Nev.).  Their complaint alleged that the GOK had orchestrated a transnational racketeering campaign to seize control of JTL's Kazakhstan-based assets, including its core subsidiaries, FH Securities and FH Jusan Bank, through fabricated investigations, regulatory coercion, and extralegal pressure tactics.

46.     The lawsuit detailed a coordinated state campaign: unwarranted civil and criminal proceedings, unlawful freezes on dividend and capital transfers, legislative threats to retroactively claw back foreign control of banks, and collusive lawsuits initiated by proxy litigants.  JH and JTL's complaint alleged that the GOK's objective was to wrest control of

14

JTL's assets from a U.S.-based endowment structure and deliver them to politically connected insiders under state cover, in violation of U.S. racketeering laws.

47.     JH and JTL's complaint did not present this as an internal political dispute—it framed the GOK's conduct as a multi-jurisdictional racketeering enterprise that harmed U.S. persons and entities, including NGF, a Nevada-registered 501(c)(4) nonprofit, and JH, its wholly owned subsidiary.  The lawsuit, with its detailed allegations explaining the scheme, was a high-stakes move designed to enlist the protection of the U.S. legal system and prevent further attempts at expropriation.

48.     But the case was not pursued to judgment.  As described below, within weeks, the same insiders who had approved the Nevada RICO suit—primarily Wahid—abandoned it as part of a broader, fraudulent settlement scheme to benefit the oligarch Yessenov and themselves.

49.     The Nevada lawsuit's abrupt dismissal was not a strategic litigation decision—it was an act of self-dealing.  It stripped JTL of its primary legal defense against asset seizure, concealed insider negotiations, and cleared the path for a fabricated arbitration "settlement" that would personally enrich Wahid, Boerner, Evans, Bekturganov, and Yessenov.  This maneuver not only contradicted the lawsuit's core allegations but directly advanced the very racketeering enterprise the Nevada complaint had sought to expose.  The legal and factual positions in the Nevada complaint now serve as damning evidence of the racketeering scheme that followed.

50.     The Defendants' subsequent conduct, including the fraudulent settlement with Yessenov and the suppression of whistleblowers, was a continuation of the same racketeering pattern they themselves alleged in their Nevada RICO action.  In short, the same entities and insiders that once claimed to be victims of a racketeering scheme switched sides and became racketeers themselves, continuing the same pattern they had once tried to stop.

**F.      Yessenov's Bogus Arbitration as a Pretext for Seizing JTL's Assets**

51.      On January 29, 2023, the oligarch Yessenov filed a Request for Arbitration before the London Court of International Arbitration ("LCIA") against JTL and its subsidiaries, FH Securities and FH Jusan Bank.  Yessenov's claims were nominally based on an alleged breach of a Shareholders' Agreement dated November 20, 2020, relating to FH Jusan Bank's acquisition of ATF Bank from Yessenov.

52.      The arbitration was a sham.  Prior to Yessenov's pursuit of a pretextual arbitration, Yessenov was involved in a dispute with FH Jusan Bank which alleged that it was actually Yessenov who owed money to the Bank.  In 2022, the Bank requested millions of dollars' worth of shares for losses the Bank sustained and which the Bank argued Yessenov was responsible for under a previously signed framework agreement.  Yessenov refused to pay.

53.      While Yessenov's arbitration purported to seek legal redress for alleged misconduct in 2020, the underlying goal was to strip JTL of its Kazakhstan-based assets under the guise of an arms-length resolution.  Indeed, the arbitration lacked any credible factual or legal foundation.  Yessenov's allegations relied on the unsupported narrative that JTL and its affiliates had conspired to deprive him of the benefits of the ATF Bank transaction.  But Yessenov had exited the ATF Bank transaction entirely, receiving a near-20% equity stake in FH Jusan Bank as compensation.  The Shareholders' Agreement on which he based his claims did not preserve any post-sale rights for Yessenov.  His Request for Arbitration did not even identify a specific contractual obligation that purportedly had been breached.  Instead, it asserted vague tort theories and unjust enrichment claims in an effort to claw back control over assets he had already relinquished.

54.     The arbitration's request for relief, which included various declarations and an unquantified demand for damages "to be assessed," was designed to manufacture the appearance of a legal controversy, rather than to pursue bona fide redress.  While no specific amount of damages was specified in Yessenov's filing, the arbitration was used to justify a "settlement" that transferred JTL's Kazakh assets—worth approximately $1.6 billion—to Yessenov.

55.     At or around the time Yessenov commenced the arbitration, he and Wahid began negotiations, ostensibly to resolve Yessenov's arbitration as well as the GOK's various challenges to the endowment structure and JH and JTL's Nevada RICO lawsuit against the GOK.  Yessenov, a politically connected oligarch, represented that he was working with and on behalf of the GOK and could secure the GOK's cooperation in a deal.  Wahid's company, Magellan, stood to benefit from the resulting transaction, and Wahid exploited his control over JTL to direct the company into a "settlement" that enriched both Yessenov and Wahid himself, as well as Evans and Boerner.  Yessenov's arbitration functioned as a procedural façade to disguise the fraudulent transfer of assets as a negotiated compromise.

56.     The use of a fabricated legal dispute as pretext for asset transfer was part of a broader racketeering scheme.  Defendants Wahid, Evans, and Boerner enabled that scheme in their roles as JTL directors, while securing large payouts for themselves.

G.     **The Sham "Settlement" Transferring JTL's Kazakh Assets to Yessenov**

57.     On or about March 7, 2023, Wahid forwarded Mr. Orynbayev a message he had received from the oligarch Yessenov outlining proposed settlement terms.  Among other things, the message previewed the contemplated structure of the deal to be outlined in a "high level Heads of Terms," including the transfer of the full suite of JTL's Kazakhstan-based assets in

exchange for a $75 million payment by Yessenov.  This message from Yessenov to Wahid also referred to a prior meeting between the two men in London.

58.     Mr. Orynbayev raised objections and urged that any arrangement include enforceable protections for the charitable mission and long-term financial independence of Nazarbayev University and Nazarbayev Intellectual Schools.  Despite his continuing role as a minority JTL shareholder and strategic advisor, Mr. Orynbayev was excluded from material further communications regarding the deal.  Wahid cited a non-disclosure agreement he signed with Yessenov and Mr. Orynbayev's lack of formal governance authority as grounds to shut him out—effectively sidelining one of the endowment structure's original architects in order to finalize the collusive transaction without internal scrutiny.

59.     On March 8, 2023—one day after Yessenov sent the proposed settlement terms to Wahid—JTL and its affiliates' outside counsel in the arbitration brought by Yessenov retained a Wahid-controlled entity, Arcanum Risk Management Limited, to "gather background information" on Yessenov.  In an engagement letter, Wilkie Farr—acting on behalf of JTL, FH Securities, and FH Jusan Bank—agreed to pay Wahid's company nearly $1 million (£800,000) to collect routine information regarding Yessenov's "professional background," "political affiliations," "financial status," "reputation," and "management of operation of ATF Bank."

60.     Just one week later, on March 15, 2023, FH Securities rejected this arrangement outright, refusing to permit any payment to Arcanum on the ground that the arrangement posed "regulatory risk" due to the "special relationship" between FH Securities and this Wahid-controlled entity.  FH Securities explained that paying Arcanum could constitute a violation of Kazakhstan's Law on Banks, exposing FH Securities to "sanctions" and other "legal risk."  It instructed that it "can neither pay [Wilkie Farr] to pay Arcanum further, nor tell them to use

funds already sent to pay Arcanum." FH Securities also noted that Arcanum did not appear on its register of related entities "due to not receiving this information, including from JTL." This attempt by Wahid to extract nearly $1 million from JTL under the guise of investigating Yessenov—while Wahid was simultaneously negotiating a corrupt settlement with Yessenov to benefit both of them personally—further illustrates the self-dealing and bad faith that permeated the entire transaction.

61.     By mid-March 2023, Wahid had cut off meaningful communication with Mr. Orynbayev and ignored his warnings about the risks of dealing with Yessenov. Mr. Orynbayev's efforts to ensure that the endowment's charitable mission be honored were met with silence or hostility. He was excluded from meetings and was never given a copy of the final transaction documents. To the extent Wahid told him anything at all, Wahid said—falsely—that the University and Intellectual Schools would be taken care of under the settlement.

62.     In March 2023, Wahid (on behalf of JTL) and Yessenov—along with JH and NGF—signed the "Heads of Terms to Settlement," which set forth core terms of the settlement ultimately approved by the JTL board, including the transfer of substantially all of JTL's assets to Yessenov for a small fraction of their value ($75 million), ostensibly to settle Yessenov's arbitration claim. Mr. Orynbayev was not aware of the details of this term sheet at the time.

63.     Around the same time, Wahid (through his company Magellan) sold his personal 2.3% equity stake in JTL to Yessenov for $15.35 million.

64.     In or around April 2023, Mr. Orynbayev expressed serious concerns about the potential Yessenov settlement to Wahid and Aidos Bekturganov. Mr. Orynbayev conveyed that he did not believe a deal with Yessenov would survive scrutiny, that it would expose those involved to public scrutiny and legal risks, that the proposed settlement effectively constituted

robbery of JTL by Yessenov, that Yessenov was already known for money laundering, and that the deal was marred by conflicts of interest. He urged Wahid and Bekturganov not to deal with Yessenov at all and instead to explore an arrangement that would actually benefit Nazarbayev University and Nazarbayev Intellectual Schools.

65.      On April 30, 2023, Mr. Orynbayev emailed Wahid and Shigeo Katsu, a former leader of NGF—copying Aidos Bekturganov and his father Nuraly, then an NGF board member—pleading with them not to transfer the endowment structure's assets to Yessenov, and instead to explore an arrangement that would actually benefit the educational institutions.

66.      But it was too late. On April 28, 2023, the JTL board approved the settlement agreement and related transactions. On May 18, 2023, the board passed an amendment to these minutes. On information and belief, these resolutions approving the settlement and related transactions were circulated to all board members' emails, including emails that are hosted on U.S.-based servers.

67.      The deal was formalized in two further documents executed in June 2023. The first, the "Settlement Framework Agreement," was entered into by NGF, JH, JTL, Yessenov, and the Government of Kazakhstan.

68.      The second, the "Settlement and Release Agreement," consummated the sham "settlement" transaction. It was signed between JTL and Yessenov. It transferred nearly all of JTL's assets—namely, (a) 99.5% of JTL's equity in FH Securities and related Kazakh assets ($1.3 billion), (b) telecom shares in Kazakhtelecom ($60 million) and KCell ($111 million), and (c) Jusan Ventures' 100% stake, worth about $100 million as of December 2022—to Yessenov for $75 million. The transaction was approved by the three directors—Wahid, Evans, and Boerner—who stood to benefit directly from its execution.

69.     These settlement documents required JH and JTL to voluntarily dismiss their pending Nevada RICO lawsuit, where they had accused the GOK of a racketeering scheme designed to expropriate JTL's Kazakh assets.  This was a critical concession, stripping the endowment structure of its principal legal leverage and legitimizing the asset transfer under the guise of legitimately purchased finality.

70.     These documents completed what was, in substance and effect, a fraudulent expropriation of nonprofit-controlled assets.  Under the false pretense of resolving a legitimate legal dispute, they executed a private payoff scheme: nearly $1.6 billion in assets were handed to a politically connected oligarch in exchange for a fraction of their value, while Wahid and his co-conspirators lined their pockets with millions through undisclosed side arrangements, fabricated compensation agreements, and equity sales.  Indeed, while JH and JTL initially sought millions in damages *from* GOK in the Nevada RICO litigation, Wahid and his co-conspirators ended up causing JTL to pay out $1.6 billion in assets *to* Yessenov ostensibly to settle that RICO litigation.

71.     In conversations during and after this period, Wahid falsely assured Mr. Orynbayev that Nazarbayev University's and Nazarbayev Intellectual Schools' interests had been protected and that the settlement terms addressed his concerns.  He even sent Mr. Orynbayev a draft press release, which stated that Yessenov would continue to finance the University and Intellectual Schools.  On information and belief, the press release was never published.  In reality, no such protections were included.  Despite assurances to Mr. Orynbayev that the educational institutions' interests were protected, they were not.  Further, Wahid and others refused to include Plaintiffs in any fair compensation or redemption of their 2.3% stake in JTL while facilitating buyouts at or near full value for all of JTL's other minority shareholders (Wahid and QAZ42) and illicit payouts to JTL's directors (Wahid, Evans, and Boerner).  They

excluded Plaintiffs at least in part because Mr. Orynbayev opposed the settlement with Yessenov.

72.    Mr. Orynbayev repeatedly insisted that the settlement should favor Nazarbayev University and Nazarbayev Intellectual Schools and refused to transact directly with Yessenov, rejecting offers that severely undervalued his 2.3% stake.  He was pressed to engage indirectly with Yessenov through a third party to secure a personal buyout, and explored this for a time when he remained under the belief that the settlement would benefit the educational institutions.

73.    On or around June 9, 2023, Mr. Orynbayev conversed with Wahid via Signal about his JTL shares.  Mr. Orynbayev still did not know the final terms of the settlement and remained under the impression that the settlement would benefit the University and Intellectual Schools.  At this time, Wahid encouraged Mr. Orynbayev to pursue a third-party intermediary to purchase his shares.  If this did not work, Wahid told Mr. Orynbayev that JTL would buy his shares directly.  Mr. Orynbayev eventually found an Austrian company, Safin Handelsgen.m.b.H (Austria), that would purchase his shares and, on or around June 27, 2023, alerted JTL about the potential buyer, seeking the board's approval of a purchase agreement.

74.    JTL would not approve the Safin transaction unless Mr. Orynbayev signed a Deed of Release and Waiver that contained a non-disclosure provision.  On August 11, 2023, JTL's general counsel, Kulzhan Mehrabi, sent Mr. Orynbayev a draft Termination Agreement of the Call Options for his shares, which included a release of liability.  On information and belief, this email was sent to Mr. Orynbayev's Gmail account which is hosted on a U.S.-based server, and copied Wahid's Magellan-Holdings email address.  On August 12, 2023, Mr. Orynbayev responded that he was unwilling to sign the agreement with the waiver and release provisions in place.  On August 24, 2023, Mr. Orynbayev's UK lawyers wrote to JTL requesting $15 million

for his shares, and his preference to be bought out directly by JTL.  JTL denied this request, leading to separate litigation initiated by Uconinvest in the UK.

75.    Mr. Orynbayev's attempt to be bought out by JTL for fair market value was never accepted, in part because he refused to provide a release and stay silent.  The exclusion of Plaintiffs from compensation for Unconinvest's JTL shares was deliberate retaliation against Mr. Orynbayev for objecting to the settlement.

76.    In addition to his JTL shares, Mr. Orynbayev and other entity officers continued to hold a minority stake in JTL's subsidiary, FH Securities.  In September 2023, Yessenov forced a mandatory purchase of these FH Securities shares pursuant to a Kazakh regulation that allows majority shareholders to buy out minority shareholders at market price.  The price paid for Mr. Orynbayev's FH Securities shares further illustrates that the settlement with Yessenov dramatically undervalued JTL's Kazakh assets.

77.    During this period, Wahid, Evans, Boerner, Bekturganov, and Yessenov relied on U.S.-based wires and infrastructure to execute the scheme.  On information and belief, drafts of the deal documents—including the Heads of Terms, the Settlement Framework Agreement, and the Settlement and Release Agreement—were exchanged via email between the parties and/or counsel located in New York, London, Washington, DC, and Virginia.  In addition, multiple discussions regarding the settlement and related side deals took place in the United States.  On information and belief, the Heads of Terms to Settlement was signed in or around McLean, Virginia in March 2023.  Settlement-related payments involved U.S.-based bank accounts.  Wahid additionally shared preliminary settlement-related information with Mr. Orynbayev that included proposed terms of the settlement and other settlement updates via WhatsApp.  On

information and belief, both parties were located within the United States when communicating about these proposed terms.

78.     The fraudulent settlement was not an isolated act—it was the culmination of a broader scheme executed by an association-in-fact enterprise composed of Wahid, Bekturganov, Boerner, Evans, Yessenov, and their affiliated entities, acting through NGF, JH, and JTL.  These individuals coordinated across jurisdictions to conceal their collusive arrangements, falsify the legal basis for the asset transfer, and use nominal governance mechanisms to approve a transaction that served their personal interests.  Wahid played the central role as architect and dealmaker; Bekturganov, Boerner, and Evans acted as enablers, facilitating document execution and suppressing internal scrutiny; Yessenov was the primary beneficiary, receiving control of $1.6 billion in assets for a $75 million payment.  Together, they operated as a continuing unit with a shared objective: to extract maximum private value from a nonprofit-controlled structure under the false pretense of legal settlement, using U.S. wires and institutions to implement and disguise the scheme.  The structure of the buyouts and payouts specifically ensured that insiders and other JTL shareholders who facilitated or cooperated with the fraudulent settlement were rewarded while the sole dissenting shareholder, Mr. Orynbayev, was denied any compensation.

79.     The staged "settlement" process was orchestrated by Wahid and rubber-stamped by fellow directors Aidos Bekturganov, Christian Boerner, and Lord Evans.  It was designed to conceal the collusive nature of the deal, simulate adversarial resolution of a fictitious dispute, and evade scrutiny from minority stakeholders and regulators.  The arbitration with Yessenov—which purportedly formed the basis of the settlement—was itself manufactured as a procedural smokescreen to enable this self-dealing transfer.

**H.      The Multi-Million-Dollar Personal Payouts to Wahid, Evans, and Boerner**

80.      The fraudulent 2023 settlement that stripped JTL of its $1.6 billion Kazakh asset portfolio did more than enrich the oligarch Yessenov—it enabled the insiders who engineered the deal to siphon off vast sums for themselves.

81.      Chief among those insiders was Defendant Ron Wahid, who secured a $47 million package through two linked instruments: (a) a $12 million "Deed of Termination," dated August 17, 2023; and (b) an "Option Side Letter," ostensibly dated November 22, 2022, granting Wahid either (i) 5 % of JTL's equity or (ii) a $35 million cash payment in lieu of that equity.

82.      In reality, both the Option Side Letter and the board resolution approving it were fabricated months later and backdated.  In his UK employment lawsuit against JTL and Wahid, JTL's Former COO Ilyas Seitayev explained that he first received the Option Side Letter and board resolution on July 4, 2023, weeks after JTL's asset transfer to Yessenov.  When Seitayev questioned the timing, JTL's general counsel, Ms. Mehrabi, admitted that JTL's board (Wahid, Evans, and Boerner) had instructed her to circulate the documents in July 2023 and backdate them to November 22, 2022.  One month later, the August 2023 Deed of Termination pointed to that backdated option to justify Wahid's combined $47 million haul.  On information and belief, this Option Side Letter was circulated to the JTL board on July 4, 2023, including Wahid's U.S.-based company Magellan-Holdings' email address.  On information and belief, Aidos Bekturganov, representing JH as a member of JTL, approved the board's resolution and circulated this signature via an email that is hosted on a U.S.-based server.  On information and belief, Wahid's termination fee was paid out of JTL's U.S.-based PNC account.

83.      The backdating was corruptly designed to create the illusion of a preexisting $35 million contractual obligation to Wahid at a time when JTL could no longer plausibly owe it.  By

July 2023, the company's principal assets—and therefore its value—had been transferred away to Yessenov; a genuine 5% stake in JTL was then worth a tiny fraction of the $35 million cash alternative under the corrupt Option Side Letter. Paying Wahid $35 million in that context was economically nonsensical and could only be explained as self-dealing by an insider hiding behind falsified dates. Even setting aside the backdating, there was no plausible justification for JTL to pay Wahid anything like these exorbitant amounts.

84.     Seitayev pressed the issue internally. On August 21, 2023, he emailed Mehrabi, warning that the backdating "might affect our previous financial statements." Mehrabi replied that the backdating had been "approved by the board" and suggested that Seitayev talk to JTL's directors, but he did not trust them. Instead, on August 22, 2023, Seitayev phoned Defendant Aidos Bekturganov, a JH director, who discouraged further inquiry and warned that any written communications would be forwarded to Wahid.

85.     Seitayev then spoke with Mr. Orynbayev in late August 2023, disclosing the scheme and seeking guidance. According to his UK lawsuit, Seitayev tendered his resignation to JTL on September 14, 2023, giving three months' notice pursuant to his employment contract.

86.     The Option Side Letter and related board resolution, stripped of their false timestamps, had no business rationale, no performance metrics, and no valuation support—only a paper trail engineered after the sham settlement with Yessenov to funnel an extra $35 million to Wahid on top of his $12 million termination bonus, all rubber-stamped by the same directors who orchestrated the asset-strip.

87.     In addition to those $47 million cash payments from JTL, Wahid also used a network of RJI-branded entities that he controlled to extract additional sums under the guise of consulting and strategic services. These included: (1) a $3 million "loan" to RJI (Middle East),

documented in an October 2022 Amendment Agreement and JTL board resolution that, per internal emails, also involved intentional backdating after the loan could not be processed through JTL's investment account as planned; (2) a $3 million "advisory agreement" with RJI (USA), which had no scope of work or reporting obligations; and (3) a £1.2 million "PR strategy" contract with RJI Capital (UK), which Seitayev described as lacking deliverables and serving no legitimate purpose.  Defendants Evans and Boerner signed off on these transfers.  On information and belief, on or around October 18, 2022, the loan agreement was circulated to the JTL board via emails that were hosted on U.S.-based servers.  On information and belief, on or around January 26, 2023, the advisory agreement and "PR strategy" contract, along with various invoices, were sent to JTL via email by an RJI employee based in the United States.  On information and belief, on or around January 27, 2023, a board resolution approving these appointments of RJI was circulated to the JTL board, including emails that were hosted on U.S.-based servers.

88.     In addition, all three JTL directors—Wahid, Evans, and Boerner—rewarded themselves in August 2023 with one-off "closing bonuses" tied to the "successful" execution of the settlement with Yessenov.  Wahid received $3.2 million, while Evans and Boerner each took $1 million.  The size and timing of these bonuses underscore that these insiders' personal financial upside was directly tied to consummating a transaction that gutted JTL's balance sheet. On information and belief, the JTL board approved these bonuses to themselves on or around August 3, 2023, and the resolutions were circulated between members via emails that were hosted on U.S. servers.  On information and belief, on August 7, 2023, Aidos Bekturganov, representing JH as a member of JTL, approved the board's resolution and circulated this

27

signature via an email that is hosted on a U.S.-based server.  On information and belief, these bonuses were paid from JTL's U.S.-based PNC bank account.

89.     In addition, Wahid sold his 2.3% equity stake in JTL to Yessenov for $15.35 million—a valuation completely at odds with the $75 million Yessenov paid for JTL's assets.  At the time of the settlement, Wahid and the board insisted the underlying Kazakh assets were nearly worthless due to regulatory risk.  But Wahid's private deal with Yessenov reflected a company valuation in the hundreds of millions—proof that this narrative was knowingly false.  On information and belief, this share purchase agreement was executed by Wahid, representing his company Magellan that held the shares, and Yessenov in the United States around the same time the Heads of Terms was signed in March 2023.  Magellan Investment Holdings Limited has offices in multiple U.S. cities.  On information and belief, the share purchase agreement and wire instructions were transmitted via email between U.S.-based parties.

90.     These side deals and buyouts were concealed from Mr. Orynbayev and other stakeholders until well after the fact.  By the time Mr. Orynbayev learned of the full terms of the transaction in August 2023, JTL's $1.6 billion in core assets—originally held in trust for the benefit of Nazarbayev University and Nazarbayev Intellectual Schools—had already been transferred, and the insiders had been paid.

91.     The following graphic illustrates the corrupt payment flows in the fraudulent and illicit side payments and benefits to insiders:



92.     Another minority shareholder in JTL, QAZ42, sold its 3% stake to Yessenov for around $24 million, further undermining any claim that JTL's assets lacked value. This deal, like Wahid's, occurred outside any transparent bidding or valuation process. While QAZ42 and Wahid were paid amounts at least approaching market value, Plaintiffs were excluded and defrauded because of their opposition to the deal with Yessenov.

93.     Soon after the June 2023 settlement, FH Jusan Bank—which was then wholly owned and controlled by Yessenov—purchased approximately $70 million in Kazakhtelecom shares. While there is no public record of the seller, Mr. Orynbayev believes that it was Yessenov, who was liquidating a portion of the assets he had acquired from JTL by causing FH Jusan Bank to purchase the Kazakhtelecom shares. If so, that single transaction would have

effectively allowed Yessenov to recoup nearly the entire $75 million he had paid for all of JTL's Kazakh assets under the settlement. It would confirm the gross undervaluation of the asset package and further demonstrate that the transaction was not a legitimate arm's-length sale, but a disguised transfer engineered to benefit insiders at the expense of the endowment structure's charitable mission.

**I.      NGF's Sale of JH to a "Defense Trust" Benefitting Wahid and Bekturganov**

94.      In or around February 2024, NGF—the U.S.-based nonprofit at the top of the endowment structure—was formally dissolved. The dissolution followed NGF's sale of its sole operating subsidiary, JH, to a newly created entity known as the JH Defense Trust.

95.      As consideration for the sale, NGF received $18 million from JTL (which included $3 million provided by JH in the form of a loan).

96.      The JH Defense Trust, which now owns JH, is a private trust established pursuant to a trust agreement between JH and Jeffrey Bronheim, a partner at Cohen & Gresser (UK) LLP and the former corporate secretary of JTL. Mr. Bronheim serves as the sole trustee. On information and belief, the trust names JH directors—Ron Wahid and Aidos Bekturganov—as beneficiaries, with Nazarbayev University and Nazarbayev Intellectual Schools as remaindermen. The trust structure appears designed to shield its assets from accountability or regulatory oversight, despite originating from a tax-exempt nonprofit. It also appears designed to benefit Wahid and Bekturganov in their "defense" of litigation springing from the fraudulent settlement and related transactions.

97.      On information and belief, the $18 million paid to NGF (plus approximately $3.3 million cash held in NGF's bank account) was not distributed to Nazarbayev University, Nazarbayev Intellectual Schools, or any other charitable entity.

98.     These transactions—together with the backdated payouts, excessive bonuses, and phony contracts—demonstrate how this corrupt enterprise operated as a racketeering vehicle. Defendants used sham legal instruments and U.S.-based infrastructure to extract charitable assets, conceal their tracks, suppress whistleblowers, and enrich themselves.

**J.      The UK High Court's Worldwide Freezing Order**

99.     On February 27, 2024, after unsuccessful attempts to resolve the dispute consensually, Mr. Orynbayev, through his investment vehicle Uconinvest LLC, filed a petition in the UK High Court of Justice against JH, JTL, Wahid, Evans, and Boerner.  The action alleged that these defendants had orchestrated a transfer of JTL's Kazakh assets to Yessenov, at gross undervalue and without compensation to Mr. Orynbayev, who, through Unconinvest, held 2.3% of the company's equity.

100.    On February 29, 2024, the UK High Court granted a worldwide freezing injunction in the amount of $27 million over JTL's assets, based on an arguable case that the settlement was executed in bad faith, that company insiders had improperly enriched themselves, and that minority shareholder value had been unlawfully expropriated.  The court found an arguable case of potential dissipation of assets and held that the equitable relief was necessary to preserve the status quo pending adjudication of the underlying claims.

101.    On June 20, 2024, following further briefing and evidentiary submissions, the UK High Court partially lifted the freeze, reducing the covered amount to $8.4 million.  In doing so, the Court found that while the asset sale might appear economically irrational on its face, the directors' justification—that JTL's assets were more valuable in the hands of Yessenov due to the GOK pressure campaign—could not be rejected at the interim stage.  Critically, however, the court did not reject the allegations of insider self-dealing and acknowledged that the reduction in

the freezing order did not amount to a determination on the merits.  The case is proceeding, with

a case management conference scheduled for October 3, 2025.

102.    The U.K. proceeding is significant not just for its substantive claims but because

it marked the first time a former insider directly challenged the settlement in court.  The

proceedings laid the groundwork for later disclosures to U.S. authorities and demonstrated that

the alleged racketeering scheme had transnational effects and ongoing consequences for U.S.-

based investors.

### K.    Mr. Orynbayev's Additional Whistleblowing and JH's Retaliation

103.    Less than a week after the UK High Court issued its $8.4 million asset freeze, on

June 26, 2024, JH sued Mr. Orynbayev in Virginia state court, alleging that he had breached his

Consulting Agreement by retaining and disclosing company documents.  JH sought injunctive

relief forcing Mr. Orynbayev to destroy the JH-related documents in his possession and $27

million in damages.

104.    On November 12, 2024, Mr. Orynbayev filed a detailed whistleblower complaint

with the IRS alleging that NGF had violated U.S. tax laws by misusing nonprofit assets for

private enrichment and failing to comply with obligations under 26 U.S.C. § 501(c)(4).  Mr.

Orynbayev filed a supplement to his complaint with the IRS on January 30, 2025.

105.    Mr. Orynbayev's IRS whistleblower submission detailed how the directors and

officers of NGF used the nonprofit's tax-exempt structure to funnel more than $1.6 billion in

assets to insiders and affiliates, including through excessive compensation and sham settlements.

It alleged that NGF knowingly submitted false statements to the IRS in its Form 1024-A and

Form 990s, that its insiders failed to report and pay U.S. tax on improper distributions, that the

organization filed incorrect numbers, and that the organization failed to file required disclosures

for foreign financial accounts and assets—including FinCEN Form 114 and IRS Form 8938—despite managing over $1 billion in offshore investments. These acts, according to the submission, were not incidental violations but part of a coordinated scheme to misuse the nonprofit's tax status and evade scrutiny.

106.    JH and NGF made other regulatory submissions that reflect wrongdoing. NGF's December 2024 Form 990 for tax year 2023 listed the book value of its membership interests in JTL as $5.5 million, but JTL's April 2025 audited financial statements filed with the UK Companies House for tax year 2023 state that JTL's net assets were approximately $70 million. NGF's December 2024 Form 990 also fails to account for JTL's $35 million payment to Wahid based on the backdated Option Side Letter and related board resolution. And Schedule O of NGF's December 2024 Form 990 misleadingly states that the assets were "repatriated to Kazakhstan," while Schedule N states that the recipient was the Kazakhstan Government, when in reality, as discussed above, the assets went to the oligarch Yessenov.

107.    Subsequently, Mr. Orynbayev was contacted by the U.S. Department of Justice and Federal Bureau of Investigation regarding the 2023 "settlement" with Yessenov and other matters described here. He voluntarily met with federal investigators and provided documents, including his complaint filed with the IRS.

108.    In May 2025, Mr. Orynbayev received a federal grand jury subpoena requiring him to produce documents in connection with a criminal investigation into the financial activities of JH, NGF, and related individuals, including in regard to the "settlement agreement."

109.    Shortly after learning of the pending federal investigation, and just prior to depositions, JH abruptly nonsuited its Virginia state court lawsuit, voluntarily dismissing its claims without explanation.

110.    Defendants also retaliated against Ilyas Seitayev, JTL's former COO and another whistleblower in the UK, for speaking to Mr. Orynbayev about the backdating of the $35 million option agreement and related board resolution benefiting Wahid.  According to his UK employment lawsuit, although Seitayev gave three months' notice of his resignation on September 14, 2023, and JTL confirmed in writing that it would pay him a contractual termination payment, he was suspended before his notice period expired.  The suspension— issued on November 26, 2023—was based on his alleged disclosure of confidential information to a "third party," which, on information and belief, referred to Mr. Orynbayev.  JTL then reneged on its written commitment to pay the termination bonus, conditioning payment on the outcome of an unspecified "investigation" and ultimately refusing to pay the amount at all.  JTL also threatened additional claims against Seitayev and Mr. Orynbayev in the UK.

111.    Throughout the relevant period, a group of individuals and affiliated entities— including the Defendants—worked together in a coordinated and sustained effort to take control of JTL's governance, divert its assets, and conceal the true nature of the transactions involved. These individuals and entities maintained regular communication, shared confidential information, and coordinated their actions across multiple jurisdictions, including the United States, the UK, and Kazakhstan.  Their joint efforts continued over an extended period, and were unified by a shared goal: to extract value from the U.S.-based endowment structure through fraudulent means, to suppress internal dissent and whistleblowing, and to launder the resulting proceeds through layers of legal and financial instruments.

112.    The conduct described above constituted a pattern of racketeering activity: it involved repeated acts of wire fraud, money laundering, obstruction of justice, and witness retaliation, all committed as part of a unified scheme to expropriate charitable assets, enrich

insiders, and conceal wrongdoing.  The predicate acts were not isolated; they were closely related in purpose, involved the same participants and victims, and occurred over a span of at least three years—demonstrating continuity and the threat of ongoing criminal conduct.

L.    **The Harm to Plaintiffs**

113.    Plaintiffs suffered direct and substantial financial harm as a result of the fraudulent racketeering scheme executed by Defendants to siphon JTL's assets into the hands of Yessenov while enriching insiders.

114.    Even after transferring half of his JTL equity to Wahid under false pretenses in December 2022, Mr. Orynbayev, through Unconinvest, continued to hold a 2.3% stake in JTL.

115.    JTL's most recently reported audited valuation as of the end of 2022—following the GOK's initial pressure campaign but prior to the fraudulent "settlement"—placed its net assets at approximately $1.6 billion.  On a pro rata basis, Uconinvest's 2.3% stake was therefore worth at least $36.8 million.  That value was obliterated in June 2023, when Defendants implemented the "settlement" that transferred substantially all of JTL's assets to Yessenov for $75 million—barely 5% of its known value—without shareholder notice, competitive process, or fairness review.

116.    Unlike Wahid, who received over $15 million for his identical 2.3% stake in a side deal with Yessenov in or around March 2023, Uconinvest received nothing.  Its shares were not redeemed, compensated, or even acknowledged in the transaction.  The practical result was a near-total wipeout of value for Uconinvest's equity—a loss of tens of millions of dollars via a scheme orchestrated by insiders acting with fraudulent intent.  That injury is a concrete, personal economic loss that is directly traceable to Defendants' misconduct.

117.     Notably, Unconinvest was uniquely and intentionally singled out for exclusion—the only JTL minority shareholder deprived of compensation and denied an exit on reasonable terms.  JH—the majority shareholder of JTL and a named Defendant here—was at all relevant times under the control of the same insiders (Wahid and Berkturganov) who orchestrated the fraudulent asset transfer to benefit Yessenov while lining their pockets and those of other themselves (Evans and Boerner).  JH did not pursue recover of behalf of JTL because it was acting in concert with the perpetrators.  Wahid, one of only three minority shareholders in JTL at the time, was himself a co-conspirator and directly profited through the $15 million sale of his personal 2.3% stake to Yessenov (in addition to then tens of millions he received in other illicit payments).  The other minority shareholder, QAZ42, was also bought out by Yessenov at or near full value.  Only Uconinvest was excluded, its shares effectively expropriated by the Defendants' self-dealing.

118.     In addition to the substantial economic loss stemming from the effective expropriation of his 2.3% equity stake in JTL, Mr. Orynbayev has suffered a range of additional harms—professional, reputational, and legal—that were proximately caused by Defendants' racketeering activity and other wrongful conduct.

119.     First, Mr. Orynbayev's reputation and standing as an international economic advisor have been materially damaged.  As a former Deputy Prime Minister of Kazakhstan and an architect of the Nazarbayev University endowment, Mr. Orynbayev built a global career on integrity, competence, and credibility.  The revelation that the endowment he helped structure was ultimately used as a vehicle for fraud and self-dealing—engineered by insiders like Wahid and ratified through bogus settlements and hidden payouts—has exposed him to reputational harm in the international investment and policy communities.

120.     Second, Defendants' actions forced Mr. Orynbayev into extensive, time-consuming, and high-stakes litigation in multiple jurisdictions, including JH's baseless lawsuit against him in Virginia state court seeking $27 million in damages for whistleblowing activity. He has been compelled to expend substantial time, legal fees, and personal effort to investigate, document, and challenge the fraudulent conduct of Defendants in order to protect his legal rights. These efforts were made necessary by Defendants' concealment of material facts, obstruction of information, and retaliatory litigation tactics.

121.     Third, Defendants' conduct exposed Mr. Orynbayev to legal and regulatory risk. Because of his former position within the endowment structure and involvement as a JH consultant, he was compelled to retain counsel and engage with federal investigators regarding a grand jury subpoena.  Although Mr. Orynbayev has cooperated fully with authorities, the fact that he was placed in this position is itself a harm—one directly traceable to the Defendants' fraudulent acts, concealment, and retaliatory behavior.

122.     Finally, the manner in which the JTL asset transfer was structured—with its secret board-level decisions, undisclosed side payouts, and elimination of nonprofit governance—left Mr. Orynbayev, as a minority shareholder, without recourse, voice, or protection.  His inability to influence or even be informed of actions that directly harmed his investment has created persistent uncertainty and exposure.  These non-financial harms—mental distress, reputational injury, compelled litigation, and regulatory risk—are the natural and foreseeable consequences of the fraudulent scheme, and they underscore the gravity and intentionality of the Defendants' misconduct.

**M.     The Harm to Nazarbayev University and Nazarbayev Intellectual Schools**

123.     Since its founding in 2010, Nazarbayev University has acted as a catalyst for modernizing Kazakhstan's higher education.  It was purpose-built as an English medium, research-intensive institution with international faculty, operating under Western-style governance models.  It quickly formed partnerships with top global universities—such as Penn, Cambridge, Duke, Pittsburgh, and others—and launched schools in engineering, public policy, business, education, medicine, and mining.  These efforts have borne fruit: the University has grown to over 7,000 students at the undergraduate and graduate levels across a wide range of fields from the sciences and humanities to medicine and engineering.

124.     Meanwhile, Nazarbayev Intellectual Schools, established in 2008 in partnership with the University of Pennsylvania's Graduate School of Education, shine as a flagship secondary education reform model.  Comprising 21 schools with 19,000+ students, the Schools aim to deliver independent educational curricula and uphold principles of academic freedom.  Their graduates—around 20,000 by 2025—have high university placement rates.  The Schools have received international recognition and serve as a pilot platform for nationwide reforms such as curriculum innovation, teacher training, and textbook development.

125.     The loss of the these institutions' U.S.-based endowment assets will deal a profound and lasting blow to the educational future of Kazakhstan.  Nazarbayev University and Nazarbayev Intellectual Schools were conceived as long-term, self-sustaining institutions—built to operate at global standards and free from the cycles of political interference and corruption that have long plagued Kazakh public life.  The $1.6 billion endowment, structured under U.S. law to protect it from such interference, was not just a financial reserve—it was the core guarantor of institutional independence, academic integrity, and educational excellence. That this

38

asset base was stripped and transferred at a tiny fraction of its value to a politically connected oligarch, while insiders enriched themselves with illicit payouts, represents not just theft—it is the deliberate sabotage of a national project.

126.    Mr. Orynbayev has devoted much of the last 15 years working to build these educational institutions, first as Deputy Prime Minister during their founding, and later as a key architect of the U.S.-based endowment structure.  The destruction of that structure for personal gain is a betrayal not only of law, but of the foundational vision that education in Kazakhstan could be world-class, honest, and permanent.  What has been lost is not only money—it is the shield that was supposed to guarantee future generations the opportunity to learn free from corruption.

### N.    The Need for Forward-Looking Equitable Relief

127.    As of the filing of this Complaint, the oligarch Yessenov continues to control the JTL assets that were transferred to him through the fraudulent 2023 settlement.  On information and belief, these assets—then worth approximately $1.6 billion—remain under his direct or indirect ownership, held through private entities that lack any charitable mandate, external oversight, or enforceable restrictions.

128.    Despite Wahid's promises to Mr. Orynbayev that the settlement would result in continued financial support to Nazarbayev University and Nazarbayev Intellectual Schools, Yessenov has not—on information and belief—used these assets for the benefit of these educational institutions or made any binding commitment to do so.

129.    Without forward-looking equitable relief, including the imposition of a constructive trust and related remedies under 18 U.S.C. § 1964(a), there is a substantial risk that

Yessenov will continue to conceal, divert, or dissipate the misappropriated funds, ignoring into the future the charitable purposes for which the U.S.-based endowment structure was created.

## CLAIMS FOR RELIEF

### Count I: Violation of 18 U.S.C. § 1962(c) – Civil RICO
### (Against All Defendants)

130.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

131.    At all relevant times, Defendants formed an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4).  This enterprise functioned as a continuing unit with a shared purpose: to extract nonprofit-controlled assets from JTL for the benefit of a politically connected Kazakh oligarch and launder proceeds through sham transactions, while personally enriching Wahid, Evans, Boerner, and Bekturganov.

132.    This enterprise operated across the United States, the United Kingdom, and Kazakhstan, and it affected interstate and foreign commerce by: (a) using U.S.-based corporate entities (NGF, JH); (b) executing legal documents through U.S.-based email infrastructure; (c) routing proceeds through U.S. financial institutions; (d) filing retaliatory litigation in Virginia to silence and discredit a U.S.-based whistleblower; and (e) leveraging interstate communications to plan, carry out, and conceal fraud.

133.    Each Defendant was employed by or associated with the enterprise and knowingly conducted or participated in its affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

134.    The racketeering activity carried out by Defendants included, but was not limited to, the following predicate acts:

a.    Wire Fraud (18 U.S.C. § 1343):

    i.    Transmission of the March 2023 and June 2023 settlement documents via U.S. servers and/or U.S.-hosted email accounts; and

    ii.    Use of fabricated documents—including backdated board resolutions and option agreements—and false dispute narratives to justify insider enrichment and misrepresent the legitimacy of the asset transfer to Yessenov.  These documents were circulated among the JTL board, which included emails hosted by U.S. servers.

b.  Money Laundering (18 U.S.C. §§ 1956, 1957):

    i.    Payment of more than $50 million in illicit "termination fees," "option payouts," and "closing bonuses" to Defendant Wahid, both directly and indirectly through his RJI-branded entities;

    ii.    Payment of $1 million "closing bonuses" to Evans and Boerner directly tied to the fraudulent settlement;

    iii.    Wahid's sale of his 2.3% equity stake in JTL to Yessenov for $15.35 million, despite the stake having been fraudulently obtained through deception of Mr. Orynbayev; and

    iv.    Use of U.S. bank accounts and entities to route and disguise proceeds from the misappropriated nonprofit assets.

c.  Obstruction of Justice (18 U.S.C. § 1512) and Witness Retaliation (18 U.S.C. § 1513(e)):

    i.    Initiating retaliatory litigation against Mr. Orynbayev in Virginia state court after learning of his retention of certain documents that contained evidence of wrongdoing, and seeking the destruction of such documents;

ii.    Abruptly dismissing that litigation upon confirmation of a pending grand

jury investigation and federal subpoenas;

iii.    Threatening further action on the basis of Mr. Orynbayev's cooperation

with law enforcement authorities; and

iv.    Issuing warnings and suppression efforts aimed at silencing

whistleblowers within JTL, including former COO Ilyas Seitayev.

d.   Criminal Tax Offenses (26 U.S.C. §§ 7201, 7206; 18 U.S.C. § 1001):

i.    Private inurement and excess benefit transactions in violation of 26 U.S.C.

§ 501(c)(4), and false representations made to the IRS in NGF's Form

1024-A and Form 990 filings;

ii.    Knowingly causing the filing of false federal tax forms and failing to

disclose required foreign financial assets to the IRS and FinCEN,

including on Form 8938 and FinCEN Form 114; and

iii.    Submission of materially false statements to the IRS under penalties of

perjury in connection with NGF's tax-exempt status and charitable

purpose, in violation of 18 U.S.C. § 1001 and 26 U.S.C. § 7206(1).

135.    These predicate acts were related by participants, purpose, and method: the same

individuals used the same methods (fraudulent communications, fabricated documents, and wire

transfers) to advance the same objective (expropriation and concealment of nonprofit assets

while retaliating against dissenters) over multiple years.  This satisfies the "relatedness" prong

under § 1961(5) and further confirms the existence of a racketeering pattern.

136.    The acts occurred from at least 2022—when Defendants first engaged with

Yessenov and Mr. Orynbayev was wrongfully induced to sell half his JTL shares to Wahid—

through at least 2025, when they continued to retaliate against Mr. Orynbayev and to conceal the misappropriated assets.  The scheme's duration, repeated acts across jurisdictions, and continued concealment and retaliation demonstrate both closed- and open-ended continuity under 18 U.S.C. § 1961(5), with the enterprise posing an ongoing threat of similar racketeering conduct.

137.    As a direct and proximate result of the pattern of racketeering activity, Plaintiffs suffered cognizable injuries to business and property, including: (a) the effective expropriation of Plaintiffs' equity in JTL (through Uconinvest) in contrast to all other JTL minority shareholders; (b) legal fees from retaliatory litigation; and (c) damage to reputation, standing, and professional opportunities.

138.    Plaintiffs' injuries were direct and personal.  Wahid defrauded Mr. Orynbayev into transferring half of his JTL shares, then excluded Plaintiffs from a redemption process that favored insiders (including Wahid himself) and compliant minority stakeholders (QAZ42).  The harm to Plaintiffs is not a generalized loss of corporate value shared equally by JTL shareholders alike, but a singularly targeted deprivation of Plaintiffs' specific equity interest, while other minority shareholders, including Wahid, received full or nearly full value.

139.    Plaintiffs seek treble damages, attorneys' fees, and costs under 18 U.S.C. § 1964(c).

## Count II: Violation of 18 U.S.C. § 1962(d) – RICO Conspiracy
### (Against All Defendants)

140.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

141.    Defendants knowingly and intentionally conspired to violate 18 U.S.C. § 1962(c). Each agreed to facilitate the enterprise's illegal objectives and committed or aided overt acts in furtherance of the conspiracy.

142.    Overt acts included: (a) orchestrating and executing sham settlement agreements; (b) laundering proceeds through U.S. institutions; (c) backdating contracts and other documents to justify insider payouts; and (d) filing a retaliatory lawsuit to try to silence whistleblowing.

143.    Each Defendant was aware of the fraudulent nature of the asset transfer and their roles in the scheme.  They operated jointly, over time, with a coordinated strategy to misappropriate corporate assets and suppress resistance.

144.    As a result of the conspiracy, Plaintiffs suffered the same harms described in Count I.

145.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to treble damages, attorneys' fees, and costs.

### Count III: Conspiracy to Injure in Business (Under Virginia Law)
### (Against All Defendants)

146.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

147.    Under Virginia Code § 18.2-500, "[a]ny person … injured in his reputation, trade, business or profession by reason of a" conspiracy under § 18.2-499, may sue to recover treble damages, attorneys' fees, and costs.  A conspiracy under § 18.2-499 is when "[a]ny two or more persons … combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever or (ii) willfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act."

148.    Defendants conspired to willfully and maliciously injure Plaintiffs in their reputation, business, and trade through unlawful means, including fraud, misappropriation, and retaliation.

149.    Defendants' conduct included: (a) depriving Plaintiffs of their equity interest in JTL without compensation; (b) disbursing JTL's assets in a self-dealing transaction; and (c) attempting to silence and discredit Mr. Orynbayev as a whistleblower.

150.    These acts caused Plaintiffs to suffer substantial financial injury unique to them among all JTL shareholders, reputational damage, and the loss of present and prospective business opportunities.

151.    Under Virginia law, Defendants are jointly and severally liable for all resulting damages.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court:

A. Award compensatory damages in an amount to be proven at trial;

B. Award treble damages pursuant to 18 U.S.C. § 1964(c);

C. Award attorneys' fees and costs;

D. Order disgorgement of ill-gotten gains;

E. Impose a constructive trust over diverted assets;

F. Issue declaratory and injunctive relief as appropriate; and

G. Grant such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Ian S. Hoffman*
Ian S. Hoffman (VSB No. 75002)
R. Stanton Jones
   (*pro hac vice* forthcoming)
Caroline L. Dorsey
   (*pro hac vice* forthcoming)
ARNOLD & PORTER
   KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, DC 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
ian.hoffman@arnoldporter.com

Michael Mazzullo
   (*pro hac vice* forthcoming)
ARNOLD & PORTER
   KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
Telephone: (212) 836-8000
Facsimile: (212) 836-8689
michael.mazzullo@arnoldporter.com

*Counsel for Plaintiffs Yerbol Orynbayev and Uconinvest LLC*